# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-1334

_____

Northshore Mining Company

*Petitioner*

v.

Secretary of Labor; Federal Mine Safety and Health Review Commission

*Respondent*s

_____

No. 21-1383

_____

Northshore Mining Company; Matthew Zimmer, employed by Northshore Mining Company; Roger Peterson, employed by Northshore Mining Company; Federal Mine Safety and Health Review Commission

*Respondent*s

v.

Secretary of Labor, Mine Safety and Health Administration

*Petitioner*

_____

Petition for Review of an Order of the
Federal Mine Safety & Health Administration

_____

Submitted: February 18, 2022
Filed: August 22, 2022
_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

SMITH, Chief Judge.

Northshore Mining Company operates an iron ore mine in Silver Bay, Minnesota. A contract worker was injured on a walkway at the mine in 2016. Subsequently, the Mine Safety and Health Administration (MSHA) conducted an investigation. MSHA issued Order No. 8897220 (Order) stating that Northshore had failed to maintain the walkway in good condition. The Order attributed the violation to Northshore's reckless disregard of and unwarrantable failure to comply with the walkway-maintenance mandatory standard. In addition, MSHA designated the violation as "flagrant."

MSHA also issued Citation No. 8897219 (Citation) stating that Northshore had failed to barricade or to warn miners away from the damaged walkway. The Citation attributed the violation to Northshore's reckless disregard of and unwarrantable failure to comply with the mandatory standard requiring barricading or posting a warning about hazards. Accordingly, MSHA proposed penalties against Northshore for violations underlying the Order and the Citation. MSHA also proposed penalties against two Northshore supervisors, Matthew Zimmer and Roger Peterson, in their individual capacities for the violation underlying the Order.

Based on the investigation and findings, the Secretary of Labor petitioned the Federal Mine Safety and Health Review Commission (Commission) for assessment of civil penalties against Northshore and the supervisors. An administrative law judge (ALJ) for the Commission granted the Secretary's petition and found that

Northshore's reckless disregard of and unwarrantable failure to comply with mandatory standards had caused the violations underlying the Order and the Citation. Notably, the ALJ deleted the flagrant designation for the violation underlying the Order. The ALJ also found that the supervisors were individually liable for the violation underlying the Order.

Northshore, the supervisors, and the Secretary filed petitions for discretionary review of the ALJ's decision by the Commission. Upon review, the Commission affirmed the ALJ's findings of reckless disregard and unwarrantable failure, affirmed the ALJ's deletion of the flagrant designation, but reversed the ALJ's findings of individual liability.

Northshore petitions for review of the Commission's conclusions on reckless disregard and unwarrantable failure. The Secretary cross-petitions for review of the Commission's conclusions on the flagrant designation and individual liability. We deny Northshore's petition for review of the Commission's conclusions on reckless disregard and unwarrantable failure and grant the Secretary's cross-petition for review of the Commission's conclusions on the flagrant designation and individual liability.

I. *Background*
A. *Factual Background*

Northshore's iron ore pellet processing plant at its mine has a conveyor gallery with two sloping conveyor belts that transport pellets upwards for loading and shipping. The gallery's primary walkway consists of an eight-foot wide center pathway. There are also two 30-inch wide, enclosed outer walkways on the east and west sides of the conveyor belts.

During normal operations, miners perform maintenance on the outer walkways every four to six weeks. They change conveyor belt supports and clean accumulated

pellets off the walkways. All three walkways are made of panels of perlite—a mined volcanic rock that is mixed into industrial building products for stability—reinforced with wire mesh fabric and a concrete topping. The center walkway includes steel reinforcement plates underneath.

The perlite on all the walkways began deteriorating as early as 2009. At that time, Northshore repaired some small holes but the concrete remained in good condition. In 2010, it stabilized the center walkway with steel plates but did not reinforce either of the outer walkways. In 2013, a Northshore engineer submitted a work order reporting falling concrete panels on the underside of the gallery to Daniel Scamehorn, the Northshore supervisor charged with providing engineering services for the mine. Northshore added the repair to a to-do list but no repair ensued.

In 2014, a Northshore maintenance planner noticed deformities in the center walkway's concrete. He submitted a work order. In response to that work order, Scamehorn reviewed maintenance records for the gallery and examined the center walkway. He "observed that [the center walkway] was cracked and that the edges of the walkway were settling." J.A. at 605. He "believed that the middle of the walkway was being heaved upward by material trapped by the steel plates." *Id*. "He did not examine the outer walkways" at that time. *Id*.

1. *KOA Report*

Scamehorn then contacted Krech Ojard & Associates (KOA), an engineering firm, to conduct a review of the walkways. KOA employees performed site visits at the mine in March and May 2015. Patrick Leow, KOA's manager of structural services, performed the latter visit. In June 2015, KOA submitted a written report, authored in part by Leow, to Northshore with its observations and conclusions.

The report described the concrete topping as being "in poor condition and [in] need of replacement due to the large surface cracking and heaving" and noted

"debonded . . . and corroded reinforcement over large areas of the walkway slab underside." *Id*. at 497. The report stated "that the deteriorated perlite slabs [were] compromised and provide[d] little to no structural support" and that the concrete topping "[wa]s also compromised [and] provid[ed] little to no structural support . . . [and] present[ed] an uneven walking surface." *Id*. at 498.

The report recommended that Northshore "prohibit[]" "[t]he use of heavy equipment cart[s]" on the center walkway. *Id*. It concluded that the outer walkways "may not contain adequate structural support" for use, "cannot be found to be structurally adequate for use," and "[we]re not safe for personnel to be using until a repair has been completed." *Id*. It recommended that Northshore restrict access to the walkways and replace the perlite and concrete layers of the walkways. And it warned that "it is necessary . . . to ensure that the structure is capable of handling its required load capacity." *Id*. Northshore estimated the total cost of the recommended repairs to be around $300,000.

After discussing the report with Leow, Scamehorn testified that he believed Leow's main concern with the gallery was the cracking on the top concrete slab. He testified that Leow indicated that he did not have concerns about potential failures of the outer walkways. Rather, Scamehorn testified that Leow thought that there were only localized spots on the outer walkways that needed attention. Scamehorn shared the report with Zimmer and Peterson.[1]

Northshore made no efforts to repair the walkways and did not prohibit access to them or put up signs warning about their condition. Scamehorn, Zimmer, and Peterson decided to implement a fall protection policy for miners on the outer walkways. Northshore did not enforce compliance with the policy.

---

[1]Zimmer was a Northshore section manager who coordinated and planned maintenance repair work in the gallery. Peterson was a section manager for operations in an area that included the gallery.

Following a work stoppage due to economic conditions in the fall of 2015, the mine resumed operations in the spring of 2016. The company received complaints from miners that material was falling from the underside of the gallery around March 2016. Northshore put jersey netting under the gallery to catch falling debris, but the roadway underneath the gallery permitted traffic to continue and it continued to send miners to work on the outer walkways. In September 2016, a worker was injured on the walkway. That accident triggered the investigation underlying this case.

## 2. *Accident & Investigation*

Evander King was a contract worker assigned to clean accumulated pellets off the east outer walkway. At the time that he was cleaning off the walkway, the walkway was covered in up to a foot of mud and accumulated pellets that impeded visibility of its condition. Peterson told the foreman assigning work to the contract workers to make sure that the workers wore fall protection.[2] He believed that protection was needed because of the "danger of slipping on the pellets or getting caught in the moving conveyor." *Id*. at 603. King was on the walkway hosing down pellets at a height of about 50 feet when the accident occurred. A diagonal cross member beam above the east outer walkway failed, causing the steel structure supporting the walkway and a segment of the walkway to drop, which resulted in serious injuries to King. Falling debris comprised of "[s]heets of caked mud and buildup," *id*. at 604, "pummel[ed] [his] head, [his] shoulders[,] and [his] back," *id*. at 34. As a result of the accident, he suffered a spinal contusion, was diagnosed with PTSD, and experienced disrupted sleep. He filed a hazard complaint with MSHA.

---

[2]The contract workers received general instructions on how to put on a safety harness and tie off with the lanyard from the harness. They did not understand that they needed to be tied off the entire time they worked on the outer walkways. In fact, King testified "that the miners were not tied off the entire time because they had to unclip their harnesses to move down the walkway when they reached the end of the lanyard." *Id*. at 603.

In response to the complaint, MSHA Inspector Terrance Norman surveyed the gallery, interviewed miners and managers, and consulted with Michael Superfesky, a civil engineer with MSHA's technical support division. Superfesky reviewed the KOA report and visually inspected the east outer walkway. He observed significant deterioration of the walkway that predated the accident, noting "very wide and deep" cracking as evidence of accelerating deterioration. *Id*. at 80. He concluded that the walkway had been structurally deficient for foot traffic prior to the accident. He noted that the walkway had been approximately four inches thick but because the 2.6-inch perlite layer was lost, the walkway had deteriorated to below half its original thickness and thus had reduced strength. He explained that the walkway's lost thickness and strength allowed the concrete slab to rotate downward when its support beam failed.

Superfesky noted that the KOA report identified the same indicators of deterioration that he observed. He highlighted that KOA did not assign a load-carrying rating for the outer walkways. He thought this odd because the report specifically noted that this was one purpose of its analysis. He explained that when an engineer cannot quantify the load-carrying capacity of a structure, then the safe load is "zero," which means the mine operator "ha[s] to stop all access." *Id*. at 84. He also asserted that fall protection does not mitigate the potential for a serious, even fatal, injury when the hazard is a structural deficiency. Inspector Norman explained that "[e]ven if tied off, [a] miner would be jolted and strike his head. He could hit equipment below and injure his back or neck, or cement could fall and hit the miner." *Id*. at 612.

After its investigation, MSHA issued the Order, in which it alleged that Northshore violated 30 C.F.R. § 56.11002. Section 56.11002 requires that "[c]rossovers, elevated walkways, elevated ramps, and stairways . . . be . . . maintained in good condition." The Order alleged that Northshore failed to maintain the outer walkways in good condition. MSHA ordered Northshore to withdraw all

miners, except those necessary to eliminate the condition, from the affected area until it abated the violation. It found the violation to be significant and substantial (S&S)[3] and the result of Northshore's unwarrantable failure.[4] During the penalty assessment phase, MSHA designated the violation as flagrant.[5]

MSHA also issued the Citation, in which it alleged that Northshore violated 30 C.F.R. § 56.20011. Section 56.20011 requires that "[a]reas where health or safety hazards exist that are not immediately obvious to employees . . . be barricaded, or warning signs . . . be posted at all approaches." The Citation alleged that Northshore failed to barricade or warn miners away from the damaged walkways. It found the violation to be S&S and the result of Northshore's unwarrantable failure. It proposed penalties of $130,000 and $69,400, respectively, for the Order and the Citation.

MSHA also issued civil penalty assessments against Zimmer and Peterson for the violation underlying the Order and proposed individual penalties of $4,300 and $4,500, respectively. Northshore and the supervisors filed notices of contest, which were assigned to an ALJ who consolidated the dockets for a single hearing.

---

[3]Violations are S&S if they "could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard." 30 U.S.C. § 814(d)(1).

[4]"Unwarrantable failure" is a term of art describing a violation greater than those that are S&S. *Id*. Some S&S violations are considered to be unwarrantable failures to comply with mandatory standards if the violations involve aggravated conduct constituting more than ordinary negligence. *Id*.

[5]A more serious violation than a violation that is the result of an unwarrantable failure can be designated as "flagrant." *Id*. at § 820(b)(2).

B. *Procedural Background*

1. *ALJ's Decision*

The ALJ credited "Superfesky's testimony that the condition of the walkway was the primary reason for its failure." *Sec'y of Lab. v. Northshore Mining Co.* (*ALJ Decision*), 41 FMSHRC 50, 63 (2019). Based on that evidence, the ALJ concluded that the violation underlying the Order was the result of Northshore's reckless disregard of the mandatory standard. As to the Citation, the ALJ determined that Northshore knew of the problem with the outer walkways but took no steps to repair them in reckless disregard of the mandatory standard.

To classify violations as resulting from unwarrantable failure, the ALJ considered factors set forth in *Secretary of Labor v. Io Coal Co.*, 31 FMSHRC 1346 (2009). These factors include:

> [(1)] the length of time that the violation has existed, [(2)] the extent of the violative condition, [(3)] whether the operator has been placed on notice that greater efforts were necessary for compliance, [(4)] the operator's efforts in abating the violative condition, [(5)] whether the violation was obvious or posed a high degree of danger, and [(6)] the operator's knowledge of the existence of the violation.

*Id*. at 1350–51.

Here, the ALJ found the most aggravating factors to be that "the problem [with the outer walkways] . . . existed prior to the [KOA] report" and that no repairs had been made by the time of the accident; that the deterioration and unsafe condition of the walkways was obvious to Northshore; and that Northshore's supervisors knew that the walkways were not safe and should have been restricted but did not repair the walkways. *ALJ Decision*, 41 FMSHRC at 64. The ALJ largely restated that analysis in finding that the violation underlying the Citation was the result of Northshore's unwarrantable failure to comply with the mandatory standard. In her discussion, the

ALJ added that Northshore did not post a warning about the walkways' condition, did not post a notice explaining the fall protection requirement, and did not place any barriers to restrict access to the walkways.

As to the ALJ's deletion of the flagrant designation for the violation underlying the Order, she found that the Secretary did not show that Northshore failed to make reasonable efforts to eliminate the violation or that the failure was "reckless." *Id*. at 67–68 (citing *Sec'y of Lab. v. Am. Coal Co.*, 38 FMSHRC 2062, 2066–67 (2016)). The ALJ found that Zimmer and Peterson were individually liable based on their knowledge of the condition of the walkways; their decision to "put the walkways on a list for later repair;" and their implementation of the fall protection policy, which she found was "an inadequate solution." *Id*. at 76.

The ALJ assessed a $60,000 penalty for each of the violations underlying the Order and the Citation and assessed a $4,000 penalty per person against the supervisors. The ALJ's decision was subsequently reviewed by the Commission.

## 2. *Commission's Decision*

In its review, the Commission affirmed the ALJ's findings that the violations underlying the Order and the Citation resulted from Northshore's reckless disregard of and unwarrantable failure to comply with the mandatory standards. It concluded that Northshore presented no viable reason for its failure to comply with the mandatory standards and that it found none.

The Commission affirmed the ALJ's deletion of the flagrant designation, applying the plain meaning of "flagrant." It specifically noted the separate terms (1) "reckless," *Sec'y of Lab. v. Northshore Mining Co.* (*Comm'n Decision*), 43 FMSHRC 1, 15–16 (2021); (2) "known violation," *id*. at 16–17; and (3) "reasonably could have been expected to cause . . . death or serious bodily injury," *id*. at 17–18. The Commission determined that the facts supported the ALJ's finding that the violation

-10-

was not reckless. It highlighted: (1) that Scamehorn shared the KOA report with the supervisors, (2) that Scamehorn followed up with Leow to get clarification on some of the report's recommendations, (3) that there is no evidence that Northshore failed to adhere to the recommendation of prohibiting use of heavy equipment on the center walkway, (4) that Northshore told miners to avoid using the outer walkways and to use fall protection while on those walkways, (5) that Northshore held numerous safety meetings with miners in which the walkways' condition was discussed, and (6) that miners did not use the outer walkways while doing conveyor belt maintenance.

The Commission concluded, "There is no substantial evidence proving the surface condition of the walkway caused, or was reasonably expected to cause, the failure of the diagonal beam and dislocation of the gallery walkway or any hazardous event such as falling through a hole." *Id*. at 20 (emphasis omitted). It also determined, "The evidence does not show that the condition of the walkway, taking into account fall protection, was reasonably expected to cause reasonably serious bodily injuries to miners." *Id*. at 22 (emphasis omitted). It additionally answered in the negative the question of "whether Northshore should have reasonably expected a miner would slip without wearing fall protection and suffer serious bodily injuries." *Id*. at 23.

The Commission held that the ALJ's findings that the supervisors were individually liable were not supported by substantial evidence. It gave five reasons for that conclusion: (1) their "maintenance and work order duties appeared to only relate to *equipment*, and not to the *building structures*, such as the walkway," *id*. at 11; (2) "the duty of arranging for repairs of the walkways fell strictly within the purview of the [e]ngineering [d]epartment, which was overseen by Scamehorn," *id*. at 10; (3) they "did not have the discretion to decide whether to initiate such repairs . . . or how to prioritize them," *id*. at 11; (4) they "did not have control over a project when it was assigned to the engineering department," *id*.; and (5) "[t]here is no evidence in the record to indicate that either . . . w[as] in a position to authorize such a large expenditure [as the walkway repair]," *id*.

Commissioner Arthur J. Traynor concurred in the majority's conclusions on reckless disregard and unwarrantable failure but dissented from the majority's conclusions on the flagrant designation and individual liability. He concluded that the Secretary's interpretation of the term "reckless" was reasonable and deserving of deference. He also believed that substantial evidence supported the ALJ's finding of individual liability because the supervisors (1) had received copies of the KOA report, (2) had implemented the fall protection policy, (3) had authority to shut down operations, and (4) were responsible for the safety of Northshore's workforce.

## II. *Discussion*

Both Northshore and the Secretary appeal the Commission's decision. Northshore petitions for review of the Commission's conclusions on reckless disregard and unwarrantable failure. The Secretary cross-petitions for review of the Commission's conclusions on the flagrant designation and individual liability.

We review the Commission's legal conclusions de novo and its factual findings for substantial evidence. *Pattison Sand Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 688 F.3d 507, 512 (8th Cir. 2012); 30 U.S.C. § 816(a)(1). "Under this deferential standard of review, we may not reverse merely because substantial evidence may also support an opposite conclusion. Yet in order to affirm, the record evidence must do more than create a suspicion of the existence of the fact to be established." *Bussen Quarries, Inc. v. Acosta*, 895 F.3d 1039, 1045 (8th Cir. 2018) (cleaned up).

## A. *Reckless Disregard*

Northshore petitions for review of the Commission's conclusions that both the violations underlying the Citation and Order were the results of its reckless disregard of mandatory standards. The Commission's conclusion on reckless disregard relied on the KOA report's "specific[] recommend[ation] [of] restricting access on the outer walkways" and Northshore's failure to do so. *Comm'n Decision*, 43 FMSHRC at 12.

The Commission concluded, "Northshore accept[ed] that it was aware of the hazards on the walkway and that, nonetheless, the walkway was not barricaded." *Id*. Northshore does not contest those conclusions on appeal. We thus deny Northshore's petition to review the Commission's conclusion that the violation underlying the Citation resulted from Northshore's reckless disregard of the mandatory standard.

As to the Order, the Commission rested its decision on the un-appealed conclusions that "Northshore permitted the violation . . . to exist for an extended period of time" and that "Northshore did not take any action to *abate* the violation prior to the accident." *Id*. at 27. Northshore's acknowledged awareness of the hazard and its failure to take action provides substantial evidence for the Commission's conclusion that the violation underlying the Order resulted from Northshore's reckless disregard of the mandatory standard.

Northshore's citation to *Bussen Quarries* in support of its arguments is unavailing. In that case, the factual basis for a violation was disputed and raised on appeal. 895 F.3d at 1041–43, 1047. Here, the Commission based its decision on "[t]he [KOA] report['s] plain[] conclus[ion] that the walkways 'are not safe for personnel to be using until a repair has been completed.'" *Comm'n Decision*, 43 FMSHRC at 28 (emphasis omitted) (quoting J.A. at 498). Even if Northshore presents contrary substantial evidence, "[w]e may not reverse merely because substantial evidence may also support an opposite conclusion." *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009).

Northshore also takes issue with the Commission's deference to the ALJ's reliance on the KOA report and her rejection of Leow's testimony about the report that he partially authored. "We give great deference to an ALJ on such a credibility determination." *Bussen Quarries*, 895 F.3d at 1045 (deferring to the ALJ's discrediting of the miner's testimony as to "how he put the pump cart where [the] [i]nspector . . . found it"). The Commission's deference to the ALJ's determination of Leow's credibility does not warrant reversal of the Commission's conclusion.

Lastly, Northshore argues that its fall protection policy "is a significant mitigating factor [that] remove[d] [its] actions . . . from the category of reckless disregard." Northshore's Opening Br. at 45. The Commission did not mitigate Northshore's negligence because it concluded that the fall protection policy "did not address the underlying violation." *Comm'n Decision*, 43 FMSHRC at 28. The Commission's rationale is in line with its precedent holding that "[i]n order to reduce the level of negligence, the operator's actions would have to correct the hazardous condition." *Sec'y of Lab. v. Lehigh Anthracite Coal, LLC*, 40 FMSHRC 273, 282 (2018). Here, the underlying violation was not the absence of fall protection but the deteriorated condition of the walkways which Northshore had not addressed. We deny Northshore's petition to review the Commission's conclusion that the violation underlying the Order resulted from Northshore's reckless disregard of the mandatory standard.

### B. *Unwarrantable Failure*

Northshore also petitions for review of the Commission's conclusions that both the violations underlying the Citation and Order were the results of its unwarrantable failures to comply with mandatory standards. The Commission concluded that substantial evidence supported the ALJ's finding that the violation underlying the Citation was the result of Northshore's unwarrantable failure to comply with the mandatory standard. This conclusion rested on the same facts underlying its review of the reckless disregard issue. *See supra* Section II.A. We deny Northshore's petition to review the Commission's unwarrantable-failure conclusion as to the Citation for the same reasons.

As to the Order, the Commission based its unwarrantable-failure conclusion on the following evidence: (1) that the violation existed from June 2015 until the accident in September 2016, (2) that the violation included the entire lengths of both outer walkways, (3) that the KOA report put Northshore on notice that the walkways were deficient, (4) that Northshore did not repair the walkways, and (5) that there was

-14-

a "danger of falling [o]n a narrow walkway while walking on [pellets]." *Comm'n Decision*, 43 FMSHRC at 26.

Northshore makes several arguments that the Commission misapplied the unwarrantable-failure factors in *IO Coal Co. See* 31 FMSHRC at 1350–51. It first argues that the Commission erred by relying on "the length of time that the violation has existed." *Id*. Northshore contends that the Commission gave insufficient consideration to its points that "the mine was idled for half the time[,] the mine instituted protective measures, and it was a rare event when the [east outer] walkway was used." Northshore's Opening Br. at 54. Second, Northshore argues that the Commission's reliance on the factor of "the extent of the violative condition" is problematic because the walkways did not have holes in their concrete slabs. *IO Coal Co.*, 31 FMSHRC at 1351. Northshore concedes, however, that the perlite layers were deteriorated. Third, it contends that the Commission misapplied the factors of "whether the operator has been placed on notice that greater efforts were necessary for compliance" and "the operator's knowledge of the existence of the violation." *Id*. Northshore argues that the Commission erroneously relied on the KOA report as putting it on notice of its deficiencies. It asserts that the ALJ unduly discounted the testimonies of its employees that they were confused by the report's referral to restricting use of the walkway. Lastly, as to the factor of "the operator's efforts in abating the violative condition," it argues that the Commission ignored its implementation of the fall protection policy. *Id*.

ALJs are required to consider all relevant unwarrantable-failure factors but have discretion in weighing those factors. *See id*. Here, the ALJ considered all of the factors and analyzed each extensively. *See ALJ Decision*, 41 FMSHRC at 63–66. Neither the Commission nor this court reweighs those factors upon review. As to Northshore's arguments that there is evidence contrary to the ALJ's conclusions on certain factors, "[w]e do not reweigh evidence presented to the ALJ." *Pattison Sand*, 688 F.3d at 514 (declining to consider a mine operator's argument that the ALJ failed

to give adequate weight to one of its witness's testimony because (1) the ALJ found that the witness's testimony lacked proper explanation and was similar to testimony he offered in another case, and (2) the ALJ found the Secretary's expert's testimony more persuasive). We deny Northshore's petition to review the Commission's conclusion that the violation underlying the Order resulted from Northshore's unwarrantable failure to comply with the mandatory standard.

## C. *Flagrant Violation*

The Secretary cross-petitions for review of the Commission's conclusion that Northshore's violation did not qualify as flagrant, on which it based its decision to affirm the ALJ. The Mine Improvement and New Emergency Response Act of 2006 (the MINER Act)[6]—which created the flagrant designation—defines the term "flagrant." A violation is flagrant when it is "a reckless or repeated failure to make reasonable efforts to eliminate a known violation of a mandatory health or safety standard that substantially and proximately caused, or reasonably could have been expected to cause, death or serious bodily injury." 30 U.S.C. § 820(b)(2). The Secretary argues that the Commission's definition of reckless is contrary to its plain meaning. He also argues that the Commission erred by reaching the issue of the meaning of "reasonably could have been expected to cause death or serious bodily injury."

"When [the Commission's] legal conclusions involve the interpretation of the [Mine] Act, we must 'give effect to the unambiguously expressed intent of Congress.'" *Pattison Sand*, 688 F.3d at 512 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). We apply the same approach to interpreting the MINER Act. "In the course of a *Chevron* analysis, a court must first consider the actual words of the statute. If the intent of Congress is clear from the

---

[6]The MINER Act amended the Federal Mine Safety and Health Act of 1977 (the Mine Act).

plain language of the statutory provision, that will be the end of the judicial inquiry." *Ark. AFL-CIO v. FCC*, 11 F.3d 1430, 1440 (8th Cir. 1993) (citation omitted). "[T]he meaning of statutory language, plain or not, depends on context. . . . [W]e must . . . look to the provisions of the whole law, and to its object and policy." *Pelofsky v. Wallace*, 102 F.3d 350, 353 (8th Cir. 1996) (internal quotations and citations omitted). "If . . . the language of the statute is ambiguous, the court may examine legislative history and other authorities to determine legislative intent." *Est. of Farnam v. Comm'r*, 583 F.3d 581, 584 (8th Cir. 2009).

"If the Act 'is silent or ambiguous with respect to the specific issue,' we defer to 'a reasonable interpretation made by the administrator of [the] agency.'" *Pattison Sand*, 688 F.3d at 512 (alteration in original) (quoting *Chevron*, 467 U.S. at 843–44). Here, the Secretary is the agency administrator. This court has held that the deference afforded to the agency administrator extends to the Secretary's litigation position. *See id.* ("[T]he Secretary's litigation position before the Commission is entitled to deference because it 'is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a . . . health and safety standard.'" (second alteration in original) (quoting *Sec'y of Lab. v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003))). Neither party argues that the MINER Act is ambiguous as to the meaning of reckless, but the Secretary alternatively argues that "[i]f this [c]ourt concludes that the . . . term[] . . . [is] ambiguous, it should defer to the Secretary's reasonable interpretation." Sec'y's Opening Br. at 47.

### 1. *Reckless*

Neither this court nor any of our sister circuits has determined the meaning of flagrant under § 820(b)(2). The Commission has only addressed the meaning of "reckless" as used in this context in the decision below. Additionally, Congress did not define the term reckless in the MINER Act.

-17-

The Commission determined that the plain meaning of reckless is "when [a mine operator] consciously or deliberately disregards an unjustifiable risk of harm." *Comm'n Decision*, 43 FMSHRC at 16. Of the many dictionary definitions it cited in support, the Commission's definition most closely resembles *Black's Law Dictionary*'s definition, which defines reckless as "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk." *Id*. at 15 n.13 (alteration in original) (quoting *Reckless*, *Black's Law Dictionary* (11th ed. 2019)).[7] The key difference between the two definitions is that the Commission turned the conjunction in *Black's Law Dictionary*'s definition—conscious *and* deliberate—into a disjunction—conscious *or* deliberate—and the Commission omitted the qualifier—*sometimes*—for deliberate.

The Commission also relied on the Third Restatement of Torts to support its definition. The Third Restatement explains:

A person acts recklessly . . . if:

(a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and

(b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk.

Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 2 (Am. L. Inst. 2010).

---

[7]The current version of the dictionary at the time of the MINER Act's passage in 2006 defined reckless the same way. *See Reckless*, *Black's Law Dictionary* (8th ed. 2004).

When the MINER Act was passed, however, the Second Restatement of Torts was the current edition. The Second Restatement reads as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (Am. L. Inst. 1965).

As Commissioner Traynor noted in the dissenting portion of his opinion, the difference between the two editions is that in the Second Restatement, "the actor is reckless if a reasonable person would realize the risk of harm, and not, as the majority contends, only where there is proof the actor had a 'conscious' or 'deliberate' expectation of harm." *Comm'n Decision*, 43 FMSHRC at 36 (Traynor, J., concurring in part and dissenting in part).

If consideration of a Restatement is helpful here, the pertinent one would be the Second Restatement. *See Haceesa v. United States*, 309 F.3d 722, 728 (10th Cir. 2002) (looking to the Second Restatement of Agency in determining "whether this [Federal Tort Claims Act] suit against the United States, arising from the actions of a nurse and health care administrators, is a suit against a 'health care provider' within the meaning of the [state] recovery cap statute"); *McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 13, 18 (1st Cir. 1996) (looking to the Second Restatement of Contracts in "determin[ing] whether a legislated change [by a state legislature] to a substantive provision of a public employees' retirement plan, as applied, transgresses the Contracts Clause of the United States Constitution"); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377, 1380 (3d Cir. 1994) (looking

to the Second Restatement of Trusts in determining whether "loan repayments were made in breach of a statutory trust created for [the plaintiffs'] benefit under the Perishable Agricultural Commodities Act"). We adhere to the general principle that "[t]he subsequent history is less illuminating than the contemporaneous evidence," and find that the Second Restatement, in effect at the time of the MINER Act's passage, does not support the Commission's contention that the plain meaning of reckless conduct is conscious or deliberate disregard of unjustifiable harm. *Hagen v. Utah*, 510 U.S. 399, 420 (1994). We also conclude that the Commission's dictionary definitions do not support its definition.

We turn next to the other sections of the MINER Act for insight on Congress's intent. *See Pelofsky*, 102 F.3d at 353. The Commission supports its definition of reckless by pointing to its prior recognition in *American Coal* "that flagrant violations [are] of a type that was not addressed in the original Mine Act." *Comm'n Decision*, 43 FMSHRC at 13 (quoting *Am. Coal*, 38 FMSHRC at 2069–70). The Commission asserts that a violation designated as flagrant could not be the same as a violation due to an unwarrantable failure—"aggravated conduct constituting more than ordinary negligence"—or an S&S violation—conduct that "create[s] a cause and effect resulting in a reasonable likelihood of a reasonably serious injury." *Id*. The Commission, however, does not explain why reckless should be defined differently when used in the flagrant context than when that term is used in the context of violations due to unwarrantable failure and S&S violations. And Northshore also does not explain why the meaning of reckless should be different in determining flagrancy.

The Commission also believes that its definition is consistent with the usage of reckless in the only other section of the MINER Act in which that term appears. That section bars liability actions for property damage or injuries sustained during mine rescues. 30 U.S.C. § 826(a) ("Limitation on certain liability for rescue operations"). It specifies, "This subsection shall not apply where the action that is alleged to result in the property damages or injury (or death) was the result of gross negligence, reckless conduct, or illegal conduct . . . ." *Id*.

The Commission asserts that by listing reckless conduct among those other terms "Congress identified three levels of misconduct" and "Congress classified recklessness as misconduct beyond gross negligence and bordering upon illegal conduct." *Comm'n Decision*, 43 FMSHRC at 14. Even if Congress intended that list of terms to be in ascending order of levels of misconduct, it did no more than show that recklessness falls somewhere in the middle of those other levels of misconduct. It does not define reckless. We conclude that Congress's intended meaning of reckless is not clear from this other section of the MINER Act.

The Secretary also urges us to consider sections of the Mine Act. The basic argument is, as Commissioner Traynor argued in his dissent, that the Commission's definition of reckless would require more egregious behavior for a reckless violation than is required to violate criminal sections of the Mine Act. But the Mine Act also does not define reckless.

The "object and policy" of the MINER Act also provides little help in discerning Congress's intent as to the meaning of reckless. *Pelofsky*, 102 F.3d at 353. The MINER Act amended the penalty section of the Mine Act to create the flagrant designation. The purpose of the Mine Act was to create a graduated penalty scheme through which MSHA would levy heftier fines for more egregious conduct by mine operators. While it is clear that Congress meant for violations designated as flagrant to be the most serious type of violation, the purpose of the MINER Act alone is not helpful in discerning Congress's intended meaning of reckless.

Lastly, we consider the legislative history of the MINER Act. *See Est. of Farnam*, 583 F.3d at 584. The Commission cited statements from a member of Congress, a U.S. Senator, and then-President George W. Bush showing their support for creating the flagrant designation to serve as a heightened penalty for "bad actors." *Comm'n Decision*, 43 FMSHRC at 12 (quoting 152 Cong. Rec. S4619 (daily ed. May 16, 2006) (statement of Sen. Michael Enzi)). The Mine Act had similarly been

enacted to increase the penalties set forth in its predecessor legislation, the Federal Coal Mine Health and Safety Act of 1969. We find that the legislative history of the MINER Act does not shed light on the meaning of reckless.

In sum, the MINER Act does not define reckless nor is its meaning readily apparent from references to other sources such as the Restatement or the Mine Act. We thus turn to the Secretary's litigation position and assess it for reasonableness. *See Pattison Sand*, 688 F.3d at 512. The Secretary adopts the definition from the Second Restatement of Torts. The Secretary defines reckless to mean "if [a mine operator] knows, or should know to ameliorate a known violation, but fails to make reasonable efforts to fix the violation." Sec'y's Opening Br. at 31. He argues that his definition is reasonable because "[t]he Commission has adopted this definition in [other] contexts." *Id*. at 32 (citing *Lehigh*, 40 FMSHRC at 283); *see also Lehigh*, 40 FMSHRC at 280 n.11 ("setting forth, using language from the [Second] Restatement of Torts . . . a description of a type of reckless disregard which describes [the foreman's] actions"). The Secretary also argues "[t]hat [his] definition also is consistent with how civil recklessness is defined elsewhere." Sec'y's Opening Br. at 32; *see also id*. at 33 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.")).

We hold that the Secretary's definition of reckless is reasonable[8] and aligns with the MINER Act's purpose. That definition builds upon the MINER Act's

_____

[8]*See Ameren Corp. v. FCC*, 865 F.3d 1009, 1010, 1012–13 (8th Cir. 2017) (holding that an FCC order "governing the rates that utility companies may charge telecommunications providers for attaching their networks to utility-owned poles" was a reasonable interpretation of an ambiguous statute "set[ting] forth methods for apportioning the cost of a pole among telecommunications providers" because the order was issued to achieve the goals related to rate equity).

predecessor legislation's implementation of commensurate penalties for increasing levels of misconduct by mine operators. *See Automated Matching Sys. Exch., LLC v. SEC*, 826 F.3d 1017, 1021, 1023 (8th Cir. 2016) (holding that the Securities and Exchange Commission's (SEC) "determination that it does not have the authority under the [Securities and Exchange Act of 1934] to permit an exempt exchange to exercise powers and responsibilities reserved for [a self-regulatory organization] to be reasonable" because it "is consistent with the [SEC's] prior reading of the Act" and "it had never before granted [such an] exemption"). We defer to the Secretary's litigation position on the meaning of reckless. *See Pattison Sand*, 688 F.3d at 512.

### 2. *Reasonably Could Have Been Expected*

The Commission averred that "reasonably could have been expected to cause . . . death or serious bodily injury," 30 U.S.C. § 820(b)(2), means a hazard created by the violation is "reasonably expected to occur and . . . create[s] a reasonable expectation of death or serious bodily [injury]." *Comm'n Decision*, 43 FMSHRC at 18. The Secretary argues that the Commission lacked authority to define that phrase because neither party raised that issue in its petition. He notes that Northshore raised the issue "for the first time in its [reply brief to the] Commission." Sec'y's Opening Br. at 39; *see also id.* at 38 (citing J.A. at 655–56 (the Secretary only petitioned for review of the ALJ's definition of reckless); *id.* at 630–54 (Northshore did not petition for review of the ALJ's deletion of the flagrant designation)). He argues that "[b]ecause Northshore first raised that issue in its reply brief, the issue was not properly before the Commission." *Id.* at 39 (citing *Sec'y of Lab. v. Sunbelt Rentals, Inc.*, 42 FMSHRC 16, 2020 WL 508744, at *5–6 (2020) (the Commission declined to consider an issue that a mine operator raised for the first time in its reply brief)).

The Mine Act limits the Commission's authority to review ALJ decisions as follows:

> If [a petition for discretionary review is] granted, review shall be limited to the questions raised by the petition. . . .

[T]he Commission may in its discretion . . . order the case before it for review but only upon the ground that the decision may be contrary to law or Commission policy, or that a novel question of policy has been presented. The Commission shall state in such order the specific issue of law, Commission policy, or novel question of policy involved. If a party's petition for discretionary review has been granted, the Commission shall not raise or consider additional issues in such review proceedings except in compliance with the requirements of this paragraph.

30 U.S.C. § 823(d)(2)(A)(iii), (B). The Commission's procedural rules state the same. *See* 29 C.F.R. § 2700.70(g) (same as 30 U.S.C. § 823(d)(2)(A)(iii)); *id.* at § 2700.71 (same as 30 U.S.C. § 823(d)(2)(B)). Here, the parties did not raise this issue in their petitions, and the Commission did not issue an order specifying that it would exercise its discretion to address this issue.

The Secretary argues that this court lacks jurisdiction because this issue was not properly before the Commission. "No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 30 U.S.C. § 816(a)(1). Northshore argues that it did not become "aggrieved" by the Commission's conclusion that the violation was not flagrant until after the Commission rendered its decision, so it had no prior right to seek review. Northshore's Reply Br. at 22 (citing §§ 816(a), 823(d)(2)(A)(ii)). The Secretary responds that Northshore's argument fails because it raised this issue in its reply brief to the Commission, which was filed before the Commission issued its decision. The Secretary is correct. "[T]o the extent that Northshore was aggrieved enough to raise the issue in its reply brief, it was aggrieved enough to raise the issue in its petition and [it] did not." Sec'y's Reply Br. at 9. We conclude that Northshore has not shown that its failure to raise this issue before the Commission in its initial briefing is excusable because of extraordinary circumstances.

-24-

Accordingly, we decline to address the Commission's definition of the phrase "reasonably could have been expected to cause death or serious bodily injury" because we lack jurisdiction. *See Sec'y of Lab. v. Knight Hawk Coal, LLC*, 991 F.3d 1297, 1311 (D.C. Cir. 2021) (rejecting the Secretary's argument—raised for the first time before that court—for lack of jurisdiction).

### 3. *Deletion of the Flagrant Designation*

The Secretary seeks reversal of the Commission's decision affirming the ALJ's deletion of the flagrant designation. Applying the Secretary's definition of "reckless," we determine whether substantial evidence supported the deletion. We hold that it did not.[9] We consider each of the key terms in the "flagrant" provision in turn—(1) "reckless," (2) "known violation," and (3) "reasonably could have been expected to cause . . . death or serious bodily injury." 30 U.S.C. § 820(b)(2).

The Commission considered Northshore's fall protection policy to be substantial evidence that supported the deletion of the flagrant designation because it reasoned that the policy "is relevant to determining whether 'conscious or deliberate indifference' existed to a safety issue." *Comm'n Decision*, 43 FMSHRC at 19. But under the Secretary's definition of reckless, the fall protection policy is not a "reasonable effort[] to fix the violation." Sec'y's Opening Br. at 31. The violation was the poor condition of the outer walkways, not the absence of fall protection. The fall protection policy was merely an effort to mitigate potential physical harm a miner might sustain should he fall from a walkway. Northshore hiring KOA to inspect the walkways, another piece of evidence the Commission relied upon, was also not an effort to fix the walkway. In fact, Northshore ignored the remedies that KOA recommended. The Commission took the position that Northshore would have "to

---

[9]We do not remand the flagrant-designation issue to the Commission because "application of the correct legal standard could lead to only one conclusion." *Union Pac. R. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 901 (8th Cir. 2013) (internal quotation marks omitted).

bury or hide the evidence in the report" in order for it to have acted in conscious or deliberate disregard of the violation. *Comm'n Decision*, 43 FMSHRC at 19. We conclude that designating a violation as flagrant does not require burying or hiding evidence of wrongdoing. Northshore's unjustified declination to begin repairing or even planning to repair the dangerous walkways suffices. We conclude that substantial evidence supports the determination that Northshore acted recklessly.

Next, as to whether substantial evidence supported the ALJ's finding that Northshore knew that it was violating the mandatory standard, the ALJ supported her finding with these facts: (1) "[w]ork orders dating back to 2013 detail[ed] concerns about cracks, debonding, and spalling of concrete on the . . . walkways"; (2) the KOA report recommended that the walkways be restricted; (3) the fact that the outer walkways had not been reinforced with steel plates, like the center walkway had; and (4) the fact that "[m]ine managers, employees, and engineers all testified that they were aware that the east [outer] walkway was not being maintained in a safe condition." *ALJ Decision*, 41 FMSHRC at 67. We conclude that substantial evidence supported the ALJ's finding that Northshore knew of its violation.

Lastly, the Commission was not authorized to define the phrase "reasonably expected to cause death or serious bodily injury." Consequently, we assess whether substantial evidence supported the ALJ's finding that "the hazards created as a result of this violation were likely to result in serious injury." *Id.*; *see also Knight Hawk*, 991 F.3d at 1306 (noting that the ALJ's factual findings are reviewed for substantial evidence). The ALJ listed the following hazards created as a result of Northshore's violation: (1) "the pellets and mud contributed to a fall hazard in an area next to a moving conveyor," (2) "the condition of the walkway created a hazard of material falling to the ground below, as well as uncertain footing and walking in the area with cracks and missing portions," and (3) "the condition of the walkway would cause it to give way, causing [a] miner to fall 50 feet to the area below." *ALJ Decision*, 41

FMSHRC at 61.[10] The ALJ supported her conclusion with the following facts: (1) Inspector Norman's determination that using the outer walkways would result in an accident; (2) the fact that the east outer walkway was covered in mud and pellets; (3) the fact that the contract workers could not see the condition of the walkway on which they stood; and (4) Inspector Norman's explanation that if the walkway gave out, a fall to the ground below would be fatal. Here, the hazards actually caused serious bodily injury to King.

The ALJ found that the violation was reasonably expected to cause death or serious bodily injury even after taking into account the fall protection policy. The ALJ noted that Northshore's fall-protection argument "assumes that miners were always correctly and appropriately tied off when using the outer walkways" and determined that the following evidence contradicted that assumption: (1) King's testimony that he and other contract workers were not tied off when they walked up the ramp to clean the outer walkways, (2) his testimony that they could not tie off the entire time because they had to unclip to move down the walkway, and (3) testimony that the contract workers did not understand that they needed to be tied off the entire time. *Id*. at 68. The ALJ also explained that "[t]he use of fall protection . . . does not mitigate the seriousness of the injury" because "[e]ven if tied off, the miner would be jolted and strike his head. He could hit equipment below and injure his back or neck, or cement could fall and hit the miner." *Id*. at 61. We conclude that substantial evidence supported the ALJ's finding that the violation was reasonably expected to cause death or serious bodily injury.

---

[10]The ALJ relied upon the same evidence that she relied upon in her analysis of whether the violations were S&S. *See id*. at 60 (considering that the Secretary must prove the following to establish that a violation is S&S: "a reasonable likelihood that the hazard contributed to will result in an injury" and "a reasonable likelihood that the injury in question will be of a reasonably serious nature" (quoting *Sec'y of Lab. v. Mathies Coal Co.*, 6 FMSHRC 1, 3–4 (1984))).

Other than the decision by the ALJ below, an ALJ has only reached the merits of the flagrant-designation issue in one other case. In *Secretary of Labor v. Winn Materials, LLC*, the ALJ determined that none of the violations of mandatory standards—requiring the mine operator to put up physical guards around certain conveyor belt parts—were flagrant because the operator "did not act with reckless disregard" of the mandatory standards, and he "found that the underlying violations in these actions were not reasonably likely to result in an injury." 36 FMSHRC 1430, 1453 (2014). As a result, the ALJ concluded that "the Secretary ha[d] not shown two of the elements necessary to support penalty assessments under [§ 820](b)(2)." *Id.*; *see also id.* at 1447–52 (holding that the operator did not act with reckless disregard but instead acted with "high," "moderate," or "low" negligence in its conduct underlying each of the violations); *id.* at 1443–51 (finding that the lack of guards did not create a reasonable likelihood of serious injury during greasing or repair work or during workers' foot travel near the conveyor belt parts). Here, the ALJ determined that Northshore acted with reckless disregard in committing the violations underlying the Order, and she determined that "the hazards created as a result of this violation," which "include tripping or falling on the walkway or through to the ground below," "were likely to result in serious injury." *ALJ Decision*, 41 FMSHRC at 67. *Winn Materials* can be distinguished because, unlike in that case, here all of the flagrant-designation elements have been met.

We grant the Secretary's cross-petition for review of the Commission's conclusion on the flagrant designation and hold that substantial evidence did not support the ALJ's deletion of the flagrant designation. The Commission, therefore, erred in affirming the ALJ's deletion of the designation. We remand to the Commission for consideration of whether the penalty amount for this violation should be reassessed in light of this designation.

### D. *Individual Liability*

The Secretary also cross-petitions for review of the Commission's determination that substantial evidence did not support the ALJ's findings that

Zimmer and Peterson were individually liable because they "were not in a position to initiate, create, or prioritize a plan to repair the outer walkways." *Comm'n Decision*, 43 FMSHRC at 11.

The Mine Act imposes liability on a corporate agent "who knowingly authorized, ordered, or carried out" a violation of a mandatory standard. 30 U.S.C. § 820(c). The Commission has held that "[i]f a person in a position to protect employee safety and health fails to act on the basis of information that gives him knowledge or reason to know of the existence of a violative condition" then that person is individually liable. *Sec'y of Lab. v. Richardson*, 3 FMSHRC 8, 16 (1981). It has also repeatedly held that "a 'knowing' violation under section [820](c) involves aggravated conduct, not ordinary negligence." *Sec'y of Lab. v. Bethenergy Mines, Inc.*, 14 FMSHRC 1232, 1245 (1992) (citing *Emery Mining Corp. v. Sec'y of Lab.*, 9 FMSHRC 1997, 2003–04 (1987)). The Secretary argues that the Commission erred by (1) failing to determine whether the supervisors were "in . . . position[s] to protect employee safety and health," Sec'y's Opening Br. at 51 (quoting *Richardson*, 3 FMSHRC at 16), and whether they "authorized, ordered, or carried out [the] violation," *id*. (quoting § 820(c)); and (2) focusing instead on whether the supervisors were "'in a position to initiate or prioritize repairs' to the outer walkways," *id*. (quoting J.A. at 728).

The Commission believed that its precedent "require[d] that the agent must be 'in a position' to remedy the condition at issue, in order for . . . liabilities to attach." *Comm'n Decision*, 43 FMSHRC at 10 (citing *Sec'y of Lab. v. Maple Creek Mining, Inc.*, 27 FMSHRC 555, 567–70 (2005)). Applying that precedent, it held that the supervisors were only liable if they were in a position to initiate, create, or prioritize a plan to repair the outer walkways. The Commission, however, erred by identifying and applying the wrong standard from *Maple Creek*. Its interpretation of *Maple Creek*'s holding reduces the inquiry to simply whether an agent has the ability to remedy the violative condition when the inquiry is, in fact, more complex.

-29-

In *Maple Creek*, the Commission reversed the ALJ's finding that two foremen were individually liable for the violation of a mandatory standard requiring that each designated escapeway in a mine "be maintained to always assure passage." 27 FMSHRC at 555 (internal quotation marks omitted). The violation involved an accumulation of water in the primary escapeway that created slippery walking conditions. *Id*. at 556–57. The Commission in *Maple Creek* concluded that "[n]either [foreman] possessed the power to take remedial action to eliminate the potential escapeway hazard involved here, i.e., neither was authorized to redesign the pumping system or to construct an alternative walkway." *Id*. at 569. It noted:

> The two foremen had taken certain actions to address the problem of excess water in the escapeway such as consistently reporting the water accumulations and (in the case of [one of the foremen]) sending two miners to repair a malfunctioning pump. On balance, [the Commission] conclude[d] that the two foremen's lack of authority to take necessary remedial action is a significant factor in this case and that their failure to take further action under these circumstances did not constitute aggravated conduct that amounts to more than ordinary negligence under section [820](c).

*Id*. (internal citation omitted). The Commission in *Maple Creek* also based its reversal of the ALJ's finding of individual liability on the Secretary's failure "to establish [that] the actions of [the foremen] . . . were lacking." *Id*.

Here, the Commission did not balance any factors such as "Zimmer and Peterson's control over the gallery area and the miners on the walkways, their lack of effort to encourage walkway repairs, and whether the [supervisors] generally were in a position to protect employee safety and health." Sec'y's Opening Br. at 52. The Commission also did not determine whether the supervisors' actions were more akin to aggravated conduct or ordinary negligence. Further, unlike the Secretary's failure in *Maple Creek* to establish the inadequacies of the foremen's actions, the Secretary here argued how the supervisors' decision to implement the fall protection policy was

-30-

inadequate to remedy the condition of the outer walkways. We conclude that the Commission erred by conducting its analysis focused solely on whether the supervisors were in a position to remedy the violative condition.

We determine de novo the legal issue of whether Zimmer and Peterson are individually liable. *See Pattison Sand*, 688 F.3d at 512. This court has not previously addressed the question presented, but decisions by two of our sister circuits inform our answer. In the first case, the D.C. Circuit reversed the Commission's conclusion that two mine supervisors were individually liable for a walkway's collapse. *See Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 108 F.3d 358, 364 (D.C. Cir. 1997). That court held that the record did not support the conclusion that either supervisor "knew or had 'reason to know' of the hazardous level of deterioration of the walkway beam that collapsed" because they addressed the known risk "that corrosion of support beams in the old plant could cause structural instability. . . . by conducting regular inspections and repairs" and when inspections were conducted by other parties "no one ever reported concern regarding the walkway beam at issue or suggested to [the mine operator] that its inspection and rehabilitation program was inadequate." *Id*.

Unlike the supervisors in *Freeman* who directly addressed the risk by conducting inspections and repairs, the fall protection policy that Zimmer and Peterson implemented did not address the risk here because they "did not take any steps to repair or maintain the outer walkways after learning of the condition, both from miner complaints and from the . . . KOA reports." *ALJ Decision*, 41 FMSHRC at 74. The circumstances here also differ from those in *Freeman* because while in that case there was no indication that the supervisors' inspections and repairs were inadequate, the fall protection policy was inadequate in the face of the KOA report's recommendation to restrict walkway access until the walkways were repaired. The fall protection policy was also inadequate because "miners could not be tied off the entire time on the outer walkways and had to unclip their harnesses to move when

performing maintenance on the conveyor belts and when hosing down the pellets." *Id*. at 76. The differences between the instant case and *Freeman* support our determination that Zimmer and Peterson, unlike the supervisors in *Freeman*, were individually liable.

In the second pertinent case, the Sixth Circuit held that "mine superintendents or foremen can be said to have knowingly authorized, ordered, or carried out violations of the [Mine Act] when they enter mines and observe violations but do nothing to stop or correct them." *United States v. Gibson*, 409 F.3d 325, 336 (6th Cir. 2005). While Zimmer and Peterson implemented the fall protection policy, that policy neither stopped nor corrected the deterioration of the outer walkways. Applying the *Gibson* court's standard, we hold that they—like the superintendents and foremen in that case—authorized, ordered, or carried out the instant violation.

We therefore grant the Secretary's cross-petition for review of the Commission's conclusion on individual liability, hold that the supervisors were individually liable for the violation underlying the Order, and reinstate the ALJ's penalty assessments against them.

## III. *Conclusion*

Accordingly, we deny Northshore's petition for review of the Commission's conclusions on reckless disregard and unwarrantable failure. We grant the Secretary's cross-petition for review of the Commission's conclusion on the flagrant designation, reverse the Commission's conclusion on the flagrant designation, and remand for consideration of whether the penalty amount for that violation should be reassessed. We also grant the Secretary's cross-petition for review of the Commission's conclusion on individual liability, reverse the Commission's conclusion on individual liability, and reinstate the ALJ's penalty assessments against the supervisors.

_____